Clarice C. ALLEN

v.

The ATLANTIC RICHFIELD
RETIREMENT PLAN.

Clarice C. ALLEN

v.

The ATLANTIC RICHFIELD RETIRE-
MENT PLAN and the Atlantic
Richfield Company.

Civ. A. Nos. 77–2875, 77–3247.

United States District Court,
E. D. Pennsylvania.

Nov. 29, 1979.

S. Walter Foulkrod, Harrisburg, Pa., for plaintiff.

Robert M. Landis, Jerome A. Hoffman, Frank H. Griffin, III, Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

The plaintiff in these actions,[1] Clarice Allen, seeks to recover death benefits allegedly due to her or the estate of her late husband, David Allen, Jr., which she contends defendants, Atlantic Richfield Company (ARCO) and the Atlantic Richfield Retirement Plan (Plan), wrongfully refused to pay. The defendants move for summary judgment.

The following facts appear in affidavits, exhibits, and depositions submitted by the parties: David Allen, Jr., was an employee of ARCO and predecessor companies from the early 1950's until his death on June 16, 1975. In June, 1971, Allen was treated for serious coronary problems. These problems continued, and occasionally interfered with Allen's performance of his job, with the result that company officials became aware he had a serious medical problem of some kind.

In April 1975, arrangements were made for Allen to undergo a coronary bypass operation, but were cancelled due to his weak condition. On June 2, 1975, Allen visited Dr. J. S. Biesenkamp, an ARCO staff physician familiar with his condition, discussed with him the bypass operation, and shortly thereafter Allen entered the hospital to have the operation performed.

On June 11, 1975, Michael Mullen, Senior Personnel Advisor at ARCO, communicated with Dr. Biesenkamp and learned that, in Biesenkamp's opinion, Allen's condition was severe enough to qualify him for early retirement on the basis of disability. On that same day, at the request of John Connell, Vice-President of the division in which Allen was employed, a company representative visited Allen in the hospital, and advised him that he might be eligible for disability retirement, and also that if he elected this option under the Plan his wife would be entitled to a substantial lump sum benefit payment in the event of his death. The representative also informed Allen that it was important for him promptly to execute the necessary forms, because under the terms of the Plan the election would not become effective until thirty days after his application was made. Allen executed the forms. Six days later, on June 17, 1975, he died after having undergone the bypass operation.

After her husband's death, plaintiff requested that the Plan pay to her the lump sum benefit provided for the beneficiary of a deceased employee who elected disability retirement. The Plan refused to tender this sum, because the regulations of the Plan require that the election of the disability retirement option be made not less than thirty days before the death of the employee, whereas Allen had died within a week of making the election. Plaintiff then instituted these actions. Because they are brought to enforce rights under a retirement plan subject to the Employee Retirement Income Security Act (ERISA), Pub.L. 93–406, 88 Stat. 832, 29 U.S.C. § 1001 et seq.

---

1. Civil Action No. 77–2875, the suit against the Plan alone, was filed in this court. Civil Action No. 77–3247, the suit against both the Plan and ARCO, was originally filed in state court and was removed to this court by defendants. I consolidated the two cases for all purposes.

The complaints are virtually identical, asserting the same facts and theories of law. For that reason, no distinction need be made between them for purposes of resolving defendants' motion.

(1975), I have jurisdiction over this matter under 29 U.S.C. § 1132(e)(1).

### Contract Theory

Mrs. Allen contends in her complaint that ARCO[2] and the Plan breached a contractual obligation owed to her husband by failing timely to inform him of the advantages of electing disability retirement. The contractual theory stems from the following provision in the booklet distributed to employees explaining the terms of the Plan:

> Your Employee Relations Representative will assist you in applying for benefits from the Plan. The Representative will provide you with the proper forms, explain the content of them and inform you of the deadlines for filing them.

Atlantic Richfield Retirement Plan, p. 17. Mrs. Allen contends that this language gives rise to a duty on the part of the Plan to ensure that each employee is personally informed of the various options available to him under the Plan whenever he experiences a change in his life situation that might entitle him to specific benefits. Plainly, the booklet itself is not a formal contract between the Plan and its members, but it is possible that Allen's contract theory is one of promissory estoppel: *i. e.,* the Plan, having induced its members to expect certain assistance in keeping them informed of benefit options, is liable to members who reasonably rely on such inducement to their detriment. *See* Restatement of Contracts, § 90 (1932).[3]

If the language of a contract is plain, the court should interpret the contract as a matter of law. *Haskins v. Point Towing Co.,* 421 F.2d 532 (3d Cir. 1970), *cert. denied,* 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 66 (1970); *Associated Hardware Supply Co. v. Big Wheel Distributing Co.,* 355 F.2d 114 (3d Cir. 1965). In my view, the "contractual" language in the booklet cited by Mrs.

Allen is unambiguous, and suggests only that administrative assistance will be made available to employees claiming benefits under the Plan. The passage does not suggest that ARCO or the Plan undertakes the responsibility to monitor the health and well-being of each individual employee to ensure that each employee will timely elect the option most beneficial to his or her particular situation. The interpretation urged by plaintiff would impose a virtually impossible burden on the administrator of the Plan, which has some 21,000 employees. It is almost inconceivable that ARCO or the Plan could have sufficient information about the health and the individual needs of each of the members to enable ARCO or the Plan to render such service.

Moreover, one provision of a writing may not be read in isolation from other provisions; the writing must be interpreted as a whole. *Law v. Reading Co.,* 312 F.2d 841 (3d Cir. 1963). In the Plan booklet at issue here, the very next sentence following the provision which plaintiff suggests lulled her husband into inactivity, states:

> You should, however, be aware of the following requirement:
>
> Your request for any form of immediate retirement allowance must be filed with the Plan not more than 90 days nor less than 30 days before the date the allowance will begin.

Atlantic Richfield Retirement Plan, p. 17. This language refutes plaintiff's contention that the clause she has cited can fairly be interpreted as reflecting a promise by the Plan to apprise each individual employee of the time when, or the option for which, to file. On the contrary, the Plan clearly placed employees on notice of the deadlines for applying for benefits, and admonished them that it was their responsibility to take the deadline into consideration when applying.

---

2. Although ARCO and the Plan are separate entities, since ARCO has assumed the duty of being Administrator of the Plan, it is responsible for the way the Plan is administered. *See* 29 U.S.C. § 1002(16).

3. Section 90 provides: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

This explicit limitation of the Plan's responsibility poses this dilemma for plaintiff: either her husband never read the cited provision in the booklet, in which case he cannot be said to have relied upon it as the reason for not making a timely application for disability benefits; or, if he did read the provision, he is chargeable with knowledge of the entire provision, including the filing deadline, in which case his alleged reliance on ARCO or the Plan to advise him of the deadline would be unreasonable.

Thus, plaintiff cannot recover under a contract theory.

*Fiduciary Obligation Under ERISA*

Mrs. Allen also contends that the defendants' failure specifically to alert her husband to the possibility that he might run afoul of the 30-day waiting period after applying for disability retirement breached their fiduciary duty under ERISA, 29 U.S.C. § 1104. Section 1104 generally places the Plan fiduciaries under a duty to exercise their powers exclusively for the benefit of Plan members; to minimize financial risk in their investment of Plan assets; and to employ "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Allen argues that a prudent fiduciary, faced with the situation confronting ARCO and the Plan here, would have notified her husband not later than April, 1975 (when the bypass operation was first scheduled), of the advantages to electing disability retirement and of the risks posed by the 30-day waiting period if he delayed in doing so.

Mrs. Allen offers no authority for her contention that the duty of a fiduciary under § 1104 extends so far as to require this type of individualized attention to the needs of the Plan's members. The case law is of no aid in deciding this question. The cases interpreting § 1104 to date deal exclusively with fiduciaries' duty to invest prudently and to avoid conflicts of interest. The legislative history, does, however, provide some indication as to how far Congress intended to extend the responsibility of fiduciaries.

The House Committee on Education and Labor, in approving ERISA's provisions relating to fiduciary duties, stated:

An important issue relates to the effectiveness of communication of plan contents to employees. Descriptions of plans furnished to employees should be presented in a manner that an average and reasonable worker participant can understand intelligently. It is grossly unfair to hold an employee accountable for acts which disqualify him from benefits, if he had no knowledge of these acts, or if these conditions were stated in a misleading or incomprehensible manner in plan booklets.

H.Rep.93–533, reprinted in U.S.Code Cong. & Admin.News (1974) p. 4646.

Clearly therefore, part of the fiduciary's duty under § 1104 is to provide employees with a comprehensive explanation of the contents of the plan. It is equally clear, however, that Congress did not intend to impose a duty to provide the kind of individualized attention urged by plaintiff here, but rather envisioned that a fiduciary could discharge its obligations through the use of an explanatory booklet, provided that the booklet adequately explained the Plan and the bases for disqualification.

Evaluated in these terms, the fiduciaries in the instant case fulfilled their duty. All Plan members were supplied with a printed booklet containing both a summary of the Plan written in non-technical language, and the text of the Plan itself in an appendix. The booklet is arranged in an easy-to-read format, with a table of contents to refer readers to particular sections. The entire plan summary runs but twenty pages. Finally, as noted above, there was clear warning to employees of the 30-day waiting period for the election of benefits to take effect. There was nothing "misleading or incomprehensible" in the booklet's explanation of the waiting period, and an "average and reasonable worker participant" could easily understand this requirement.

Accordingly, since the booklet by itself adequately explained the waiting period, and since there is no indication that Congress intended to impose any further duty on Plan fiduciaries, I conclude as a matter of law that the defendants have fulfilled their fiduciary duty.

### Assumption of Duty

Mrs. Allen also argues that even if neither the wording of the Plan itself nor ERISA required the defendants to warn employees about the risks posed by the 30-day waiting period provision, defendants, by their own conduct, assumed the duty to do so. Mrs. Allen relies upon traditional tort concepts in making her argument. The rule in Pennsylvania with respect to assumption of a duty is that one who gratuitously undertakes to render services to another incurs liability only if the party served is injured by the person's failure to exercise due care in rendering the services, or if he is injured by reliance on the person's undertaking. *DeJesus v. Liberty Mutual Insurance Co.*, 423 Pa. 198, 201, 223 A.2d 849 (1966).[4] Mrs. Allen argues that ARCO and the Plan assumed a duty to keep employees informed of appropriate options under the Plan, and then failed to exercise due care by not giving her husband timely warning about the effect of the 30-day waiting provision.

The threshold question is whether ARCO or the Plan did assume the duty to warn Allen of the effect of the waiting requirement. Under Pennsylvania law, as a general rule, in a tort action the court must decide as a matter of law whether the defendant in an action owed a duty to the plaintiff. *See McNello v. John B. Kelly, Inc.*, 283 F.2d 96, 100 (3d Cir. 1960); *Dalhlstrom v. Shrum*, 368 Pa. 423, 425–26, 84 A.2d 289 (1951). *See generally* Prosser, Torts 206 (4th ed. 1971). However, where the issue is not whether the law generally recognizes the existence of a duty, but rather whether the defendant by his conduct assumed a duty under the particular circumstances of the case, the existence of a duty is properly a jury question. *See McNello, supra*, 283 F.2d at 100. Thus, for purposes of this motion the question is whether, accepting all of Mrs. Allen's allegations as true, there are sufficient facts from which a jury could reasonably conclude that a duty arose under the circumstances.

Mrs. Allen contends that prior to her husband's death ARCO adopted a policy of suggesting to individuals in poor health that they make a timely election for a disability retirement. As proof that ARCO adopted such a policy, Mrs. Allen cites the practice of John Connell, Vice-President of the division in which her husband was employed. Connell testified at deposition that when an employee "close to him" in his division was seriously ill, he considered it "good management practice" to seek an accurate medical report on the employee's condition, and where appropriate, to suggest the option of disability retirement. Connell testified that he was not, to his knowledge, following any company directive in adopting this procedure, and that he could recall only three employees other than decedent for whom he had used it. Despite extensive discovery, plaintiff has uncovered no evidence that any other management representatives or staff physicians at ARCO followed a similar practice.

On these facts, I conclude that a jury could not find that ARCO or the Plan owed a duty to advise employees which elections to make under the Plan. Connell was a division Vice-President, in charge of some 500 employees out of more than 20,000 enrolled in the Plan. Connell himself did not have a policy that he applied to every employee in his division; he occasionally offered advice to employees who were "close to him." Such evidence would at best questionably establish that Connell had adopted a practice in his division, but such a practice

---

4. Technically, the rule is that liability arises only for *physical* injury to the plaintiff's person or property, and therefore arguably the rule is not applicable in this context. Plaintiff, however, is merely invoking tort principles by way of analogy, and strict application of the rule here is inappropriate.

adopted by one division chief on his own initiative is not sufficient to create a duty on the part of ARCO or the Plan to take similar steps with every employee. The isolated practice is simply not enough proof for the existence of an overall policy for the Plan.

The defendants' motion for summary judgment will be granted.