**Eileen HOPKINS, Individually, and Eileen Hopkins, as Executrix of the Estate of John R. Hopkins, Deceased, Plaintiffs,**

v.

**FMC CORPORATION, and the FMC Corporation Salaried Employees' Retirement Plan, Defendants.**

No. C–C–79–91–P.

United States District Court, W. D. North Carolina, Charlotte Division.

March 25, 1982.

Wayne P. Huckel, Lee West Movius, of Kennedy, Covington, Lobdell & Hickman, Charlotte, N. C., for plaintiffs.

Richard A. Bigger, Jr., William H. Sturges, of Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, P. A., Charlotte, N. C., for defendants.

### MEMORANDUM AND JUDGMENT

POTTER, District Judge.

### FINDINGS OF FACT

1. The Plaintiff, Eileen Hopkins, is a citizen and resident of Cleveland County, North Carolina.

2. The Defendant, FMC Corp. ("FMC") is a Delaware corporation with its principal place of business in Chicago, Illinois. It employs approximately 45,000 persons and administers various retirement plans. The plan at issue in this case is the FMC Corporate Salaried Employees' Retirement Plan ("The Plan"), which covers approximately 17,000 of its employees.

3. This action was brought under the Employees' Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001–1381. Jurisdiction in this case is based upon Section 1132(f) of the Act and upon diversity, pursuant to 28 U.S.C. § 1332.

4. The Plaintiff is the widow of John R. Hopkins who was employed by FMC or its predecessor from 1935 until his death on April 10, 1976 at the age of 63. Mr. Hopkins was a continuous participant in the plan for over thirty (30) years until his death, and Plaintiff was his designated beneficiary under the Plan.

5. On June 17, 1969, Mr. Hopkins received, dated and signed, a Booklet published by FMC and distributed to all its employees. [Exhibit 3] The Booklet, entitled "FMC Corporation Salaried Employees' Retirement Plan", was merely an attempt "to summarize the principal features of [the Plan]"; a copy of the "official text [was] . . . available upon request. . ." [Page 16 of the Booklet.]

6. On Page 5 of the Booklet under the heading "When You May Retire": "Your normal retirement date is the first day of the month coinciding with or next following your 65th birthday. . . . You may, if you wish, retire as early as age 55." [Exhibit 3, page 5] (This early retirement option was reflected earlier in Mr. Hopkins' memo to J.A. Shull of May 28, 1969 [Exhibit 11]).

7. On Page 14 of the Booklet, under the heading, "Death or Termination Benefits" and the subheading "Death Before Retirement": "If you die before retirement and *after* reaching age 55, your beneficiary will receive a monthly income from Company contributions for *five years.* This monthly income will be figured as if you had taken early retirement. . ." [emphasis in original] and under the subheading "Death After Retirement": "If you die after retirement while receiving normal or early retirement benefits, such benefits will automatically end with your death. However, if payments for 60 months have not been made from Company contributions, monthly payments shall be made to your beneficiary for the unpaid balance of the 60 months." [Exhibit 3, Page 14].

8. On Page 13 of the Booklet, under the heading, "The Form and Duration of Your Benefits", three programs are outlined: "Normal Form", or 60 monthly payments to the employee or his or her survivor; "Level Income Form", for the early retiree, an automatic adjustment for the addition of social security benefits at 65; and "Joint and Survivor Form", under which smaller payments are made to the retiree for life, then after the death of the retiree, payments are made to the designated joint annuitant until his or her death. The Booklet explained the steps to be taken by the employee to take advantage of the Joint and Survivor program:

> To make such an election you must notify the Plan Committee in advance of your normal or early retirement date, and unless you do so at least one year in advance, the Committee may require proof of your good health. Once made, your election cannot be changed without the consent of the Committee. But, if you or your joint annuitant die before you retire, your election of a Joint Annuity is cancelled automatically.

[Exhibit 3, Page 13].

9. Notes dated "June, 1969" in Mr. Hopkins' handwriting, written on the inside back cover of the Booklet evidence a thorough study of the three programs outlined on Page 13 and the death provisions on Page 14; specifically, "This plan should allow EMH at least $5,500/yr. for 5 years if death before retirement." [Exhibit 3, cover].

10. Mr. Hopkins became ill in 1969 and suffered a heart attack in 1970. Between February 6, 1967 and October 28, 1975, he

visited his physician, Dr. Ralph V. Kidd, 40 times. During this period, Dr. Kidd observed that Mr. Hopkins was psychologically stable, mentally alert, and evidenced no signs of any mental deficiencies. [Stipulation filed March 10, 1982] In light of Mr. Hopkins' heart condition and his years of service, FMC management initiated a series of internal memoranda from November 1973 to August 1974, not directed to Mr. Hopkins, setting forth calculations of the monetary value of the retirement and disability benefit options available to Mr. Hopkins. [Exhibits 12, 13, 14, 17, and 21].

11. On July 12, 1974, Mr. Hopkins received an inter-office memorandum from R. R. Kindron, notifying him of an "open enrollment" period for Long Term Disability Insurance in which no evidence of insurability was required. [Exhibit 15]. The advantages of the insurance were listed:

"1. Benefits payable . . . are not subject to income tax.

2. A minimum payment of $100 per month is now payable.

3. While on LTD, the employee accrues service credit towards retirement."

Mr. Kindron stated, "I believe that you should take advantage of the option. . . . Should you have any questions, do not hesitate to contact Mr. Duggan . . . [Employee Relations Manager]".

12. On July 16, 1974, Mr. Hopkins signed the authorization form for disability insurance deductions from his pay. [Exhibit 16]

13. On August 16, 1974, Mr. Hopkins received an inter-office memorandum from R. R. Kindron [Exhibit 18], explaining the difference between the 60-month retirement benefits plan and the Optional Joint and Survivor Annuity. Mr. Hopkins was notified that "[i]t takes one year for the option to be enforced," and was told "if you have any questions please call Maurice Duggan."

14. On August 20, 1974, Mr. Hopkins signed the Election of Optional Annuity Form [Exhibit 19], designating Eileen M. Hopkins as joint annuitant with 100% coverage.

15. On October 14, 1974, Mr. Hopkins met with Maurice Duggan to discuss Short Term Disability, Long Term Disability, and retirement options. Mr. Hopkins' notes from that meeting indicate five questions:

1. Length of FMC service at age 65?

2. Average earnings for calculating retirement at 65?

3. Blue Cross and Blue Shield *after* 65?

4. Life Insurance *after* 65?

5. When eligible for social security?

[Exhibit 22, Page 2]. [emphasis in original].

Attached to Mr. Hopkins' own notes were calculations comparing income on LTD: "1,255.84 (Not Taxable)" to income received if early retirement taken at age 62: "863.-67" less "Est. Fed. Income Tax." [Exhibit 22, Pages 3–4].

16. On December 4, 1974, shortly after his 62nd birthday, Mr. Hopkins' status was changed from active employee to that of an employee on Short Term Disability Leave of Absence. His salary continued unchanged for six months.

17. On February 13, 1975, Mr. Hopkins wrote Maurice Duggan a five-page letter [Exhibit 23], enumerating four questions regarding "the ramifications of my retirement. . . ." Summarized, they are:

1. the sources and the inconsistent levels of the monthly income received during STD

2. health insurance coverage

3. amount of life insurance coverage

4. withdrawal of shares of common stock.

Mr. Hopkins closed by emphasizing that these issues were "important to me in my planning." [Exhibit 23, Page 5].

18. In a letter dated March 5, 1975, Mr. Duggan responded separately to each question raised by Mr. Hopkins. [Exhibit 24].

"The first item which I feel needs clarification is your present status. . . . At present, you are an active employee on a short term disability. This disability period began on December 10, 1974, and will extend for 26 weeks. At that time, you will go on long term disability until you

are age 65, if you are still disabled. If your disability extends until age 65, you will be retired at your normal retirement date."

[Exhibit 24, Page 1]. In response to Mr. Hopkins' question regarding life insurance, Mr. Duggan wrote:

"Your life insurance benefits will remain at their present level . . . until you are 65. This assumes that you will continue paying the . . . contribution, and that you remain an employee until age 65."

[Exhibit 24, Page 3]. Mr. Duggan closed by stating,

"[i]f you have any questions, please contact me directly."

[Exhibit 24, Page 4].

19. On June 10, 1975, Mr. Hopkins' status was changed to Long Term Disability Leave of Absence [Exhibit 26] and his tax-free disability payments were equivalent to one-half of his former salary. FMC continued to pay health and, later, life insurance premiums; the offset for Social Security disability payments was frozen; and his final average five years of compensation would have been higher than if he had retired at that time.

20. On September 1, 1975, the 100% Joint and Survivor Annuity coverage commenced, as the memorandum from R. R. Kindron on August 16, 1974 had explained. With this coverage available, Mr. Hopkins was free to retire with smaller payments for the remainder of his life and continuous payments to his designated joint annuitant for her life after his death. Mr. Hopkins did not retire, but remained on Long Term Disability.

21. On January 12, 1976, Mr. Hopkins received a form letter from Maurice Duggan to all "Salaried Employees", which explained modifications made in the Plan, necessitated by the passage of ERISA. [Exhibit 8]. The form letter first restated the benefits received upon death pre-retirement, as described in the 1969 Booklet: payments "for a guaranteed period of five years." Then the letter explained the change:

On January 1, 1976, a "Pre-Retirement Survivor's Benefit" provision replaced the five-year provision. This new provision provides for a monthly benefit to be paid for the entire life of the beneficiary—not just five years. The amount of the lifetime benefit will be equivalent to one-half of what the employee would have received if the employee had retired immediately prior to death with the 100% joint and survivor's benefit.

[Exhibit 8, Page 1].

22. On April 1, 1976, Mr. Hopkins mailed his life insurance premium to FMC with a note in his own handwriting. [Exhibit 31]. On April 8, 1976, due to a change in policy, Mr. Hopkins' check for this premium was returned with a note explaining that the premiums from then on would "be paid for by the Company until you reach retirement age" [Exhibit 32].

23. On April 10, 1976, five months after his last appointment with his physician, Mr. Hopkins died of a sudden heart attack at the age of 63. [Exhibit 35]. Plaintiff, as his sole beneficiary, became eligible for the "Pre-Retirement Survivor's Benefit" explained in the January 1, 1976 form letter. She presently receives a 50% Joint and Survivor's benefit under that program, approximately $231.88 per month. This amount has been recently increased by approximately 8%.

## DISCUSSION

*Fiduciary Duty*[1]

As a preliminary matter, it should be noted that any right of the Plaintiff, the designated joint annuitant under FMC's

---

1. Plaintiff alleged breach of contract as an additional count in the Complaint; however, this theory was neither argued to the Court nor included in Plaintiff's trial brief. Plaintiff's contract theory is defeated because the employee is charged with knowledge of the Plan by the language in the company Booklet which he received. *Anthony v. Ryder Truck Lines*, 611 F.2d 944, 948 (3d Cir. 1979); *Allen v. Atlantic Richfield Retirement Plan*, 480 F.Supp. 848, 851 (E.D.Pa.1979) aff'd, 633 F.2d 209 (3d Cir. 1980).

100% Joint and Survivor Annuity, to receive payment thereunder is a derivative right only. The Plaintiff was never independently eligible to claim survivor benefits. *Hernandez v. Southern Nevada Culinary and Bartenders Pension Trust*, 662 F.2d 617, 620 (9th Cir. 1981); *Wyzik v. Crane Co. Employee Benefit Plan*, 512 F.Supp. 1222, 1223 (D.Mass.1981), app. dismissed, 663 F.2d 348 (1st Cir. 1981) [untimely]. Plaintiff's understanding of what she would receive under the Plan has no bearing on the duty of the fiduciary in its dealings with its employee. The failure of the employee's acts to effectuate his alleged intent only results in a cause of action if the employee's acts are the direct result of the negligence of the Company in its dealings with its employee.

Plaintiff alleges that Defendant has breached its fiduciary duty to Mr. Hopkins at common law and under Section 1104 of ERISA, which reads:

§ 1104. Fiduciary duties

(a)(1) Subject to sections 403(c) and (d) [29 USCS § 1103(c) and (d)], 4042 [29 USCS § 1342], and 4044 [29 USCS § 1344], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

\*    \*    \*    \*    \*    \*

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

Section 1104 has been interpreted to require a company "to provide employees with a comprehensive explanation of the contents of the plan." *Allen v. Atlantic Richfield Retirement Plan*, 480 F.Supp. 848, 851 (E.D.Pa.1979), aff'd, 633 F.2d 209 (3d Cir. 1980).

Plaintiff does not deny that Mr. Hopkins received a printed booklet from the Company containing a comprehensive summary of the Plan written in non-technical language in 1969. Plaintiff alleges, however, that Defendant negligently failed to fully and accurately explain to Mr. Hopkins the application of the Booklet's provisions to his LTD status in 1975. Plaintiff asserts that Mr. Duggan, Employee Relations Manager, had a duty to explain in his March 5, 1975 letter to Mr. Hopkins the automatic cancellation of the 100% Joint and Survivor Annuity upon the death of an employee pre-retirement. [Booklet Page 13].

Mr. Duggan's letter of March 5, 1975, [Exhibit 24], was extremely narrow in scope, addressing only Plaintiff's status as a pre-retirement employee and the four questions which Mr. Hopkins had brought to his attention. None of those four questions addressed either death during Long Term Disability or the Joint and Survivor Annuity. Moreover, at the time of Mr. Duggan's letter, Mr. Hopkins was not yet covered by the Joint and Survivor Annuity. The one-year waiting period would not expire until September 1, 1975.

Plaintiff presents no evidence to support her contention that on March 5, 1975, Mr. Duggan knew or should have known of: (1) Mr. Hopkins' alleged concern for death from September 1975 on, when his death would cancel the Annuity, or (2) Mr. Hopkins' alleged lack of knowledge or understanding of the Annuity cancellation provision. There is no evidence that Mr. Hopkins ever notified FMC of any such concern or confusion.

The fiduciary duty which Plaintiff seeks to impose in this case is not supported by the case law and is an unreasonable burden. Defendant has 17,000 employees on this Plan alone; it would be practically impossible to comprehensively address all of their individual concerns unsolicited. See, *Allen v. Atlantic Richfield Retirement Plan, supra; Shlomik v. Retirement Plan of the Amalgamated Insurance Fund*, 502 F.Supp. 240 (E.D.Pa.1980).

The Court finds Plaintiff's reliance on *Gediman v. Anheuser-Busch, Inc.* 299 F.2d 537 (2d Cir. 1962) misplaced. In that case, the company hired consultants who, instead of providing the employee with the calcu-

lated monetary difference of $48,000 between death pre- and post-retirement, merely stated that the former death benefit "would not be as much." *Id.* p. 541, n.2 ¶ 3.

The Court in that case found that such a vague statement supplied *at the employee's request* was negligence through misinformation. The Court held that a company which undertakes to give advice to an employee regarding retirement benefits must do so in a clear and careful manner.

In the case at bar, however, the employee had in his possession since 1969 a Company Booklet which clearly stated "if you or your joint annuitant die *before* you retire, your election of a Joint Annuity is cancelled automatically." [Exhibit 3, Page 13]. At no time was there a *mis*statement by FMC of this automatic cancellation provision; there was simply no *re*statement of it until January 1, 1976, when the "Pre-Retirement Survivor's Benefit" was made available. [Exhibit 8, Page 1].

Most important to this case is the absence of employee-initiated inquiry into the Annuity cancellation provision, despite repeated opportunities provided by the Company and thorough inquiries by Mr. Hopkins into other areas, each addressed clearly and completely:

(1) memo explaining LTD on July 12, 1974 directing questions to Mr. Duggan. [Exhibit 15].

(2) memo explaining Annuity on August 16, 1974 directing questions to Mr. Duggan. [Exhibit 18].

(3) notes of meeting with Mr. Duggan on October 14, 1974 confined to events occurring at normal retirement age— 65. [Exhibit 22].

(4) Mr. Hopkins' letter of February 13, 1975, failing to address Annuity. [Exhibit 23].

(5) Mr. Duggan's letter of March 5, 1975 inviting further questions. [Exhibit 24].

Further, the ability of Mr. Hopkins to write a personal note to FMC on April 1, 1976 [Exhibit 31] leads the Court to believe that Mr. Hopkins was capable of submitting a letter of retirement or a letter of inquiry regarding the Annuity cancellation provision in January, February, or March, 1976 after receiving notice of the change in pre-retirement benefits on January 12, 1976. [Exhibit 8]. Even if Mr. Hopkins incorrectly believed that the changes discussed in the January 12, 1976 letter did not affect his coverage, because they were "not retroactive" [Exhibit 8, Page 2], he would have read the restatement of the 1969 provision [Exhibit 8, Page 1] which would have controlled his death pre-retirement. He had been aware of his pre-retirement status since March 5, 1975 [Exhibit 24] and therefore had an entire year to change his status or at least inquire as to Annuity coverage upon pre-retirement death. It was his own inaction that resulted in the cancellation of the Annuity, not an omission on behalf of FMC.

The combination of the Booklet provided in 1969 and the January 12, 1976 letter updating the benefit available upon death pre-retirement satisfies the fiduciary duty owed by the Company to its employees to provide a comprehensive explanation of the benefits available. Those inquiries which Mr. Hopkins directed to FMC were answered in a clear and careful manner.

## CONCLUSION OF LAW

The Plaintiffs have failed to carry their burden of proof to show by the greater weight of the evidence that the Defendants breached their fiduciary duty either at common law or under the Employee Retirement Income Security Act by negligent omission or misrepresentation in their provision of information to Mr. Hopkins regarding the Plan.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the Plaintiffs have and recover nothing of the Defendants, that the action be dismissed on the merits, each party to pay their own costs, including attorney fees.