9 F.3d 445
 17 Employee Benefits Cas. 1784
 ELECTRO-MECHANICAL CORPORATION, Plan Administrator for the
Employee Benefit Plan of Line Power Manufacturing
Corporation, Plaintiff-Appellee,
v.
Douglas L. OGAN, Karen E. Ogan, individually and as next
friends of Nathan Douglas Ogan, a minor, Hamilton Bank of
Upper East Tennessee, Special Guardian, and Hamilton Bank of
Upper East Tennessee, Defendants-Appellants.
 No. 92-6256.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 1, 1993.
Decided Nov. 3, 1993.
 
 1
 William C. Bovender (argued and briefed), Hunter, Smith & Davis, Kingsport, TN and C. Thomas Davenport, Jr., Bristol, VA, for plaintiff-appellee.
 
 
 2
 Olen G. Haynes (argued and briefed) Hicks, Arnold, Haynes & Sanders, Johnson City, TN, for defendant-appellant.
 
 
 3
 Before: RYAN and BOGGS, Circuit Judges; and ECHOLS, District Judge.*
 
 
 4
 ECHOLS, District Judge.
 
 
 5
 In this appeal, Defendants-Appellants, Douglas L. and Karen E. Ogan ("the Ogans"), individually and as next friends of their son, Nathan Douglas Ogan, and Hamilton Bank of Upper East Tennessee ("Hamilton Bank"), challenge the district court's grant of summary judgment in favor of the Plaintiff-Appellee, Electro-Mechanical Corporation ("Electro-Mechanical"), 820 F.Supp. 346, the Plan Administrator for the employee benefit plan of Line Power Manufacturing Corporation. By granting Electro-Mechanical's Motion for Summary Judgment, the district court declared that Electro-Mechanical was entitled to recoup the full amount of its subrogation claim against the settlement proceeds of the medical malpractice action brought by the Ogans on behalf of their son, Nathan Ogan, as well as any future medical expenses it will pay on Nathan's behalf. For the reasons more fully outlined herein, we affirm the district court's decision.
 
 
 6
 Douglas L. Ogan has been an employee of Line Power Manufacturing Company ("Line Power") for seventeen years, the last twelve years of which he has served in the position of a supervisor. He is a participant in Line Power's employee health benefit plan ("the plan") which covers both employees and their dependents. It is undisputed that the plan is governed by the Employee Retirement Income Security Act, 29 U.S.C. Sec. 1002(1) (1988) ("ERISA").
 
 
 7
 Prior to August 1987, the plan was funded by insurance purchased from various outside providers. During this time, the plan did not contain a subrogation provision. On August 22, 1988, Line Power created a new employee benefit plan which was self-funded and which included a subrogation clause which read as follows:
 
 
 8
 If any payment is made under this Plan, the Plan Administrator will be subrogated to all the rights of recovery of the covered person to whom or for whose benefit the payment was made, to the extent of the amount paid. The covered person will execute and deliver instruments and papers and do whatever else is necessary to secure these rights and will do nothing to prejudice such rights.
 
 
 9
 On January 1, 1992, this new plan was further amended to clarify the language of the subrogation clause as follows:
 
 
 10
 If any payment is made under this Plan, the Plan Administrator will be subrogated to all the rights of recovery of the covered person for whom benefits are paid.
 
 
 11
 If you or your Dependents recover damages from a third party(ies) which related to a condition for which the Plan incurred expenses, the Plan shall be entitled to reimbursement to the extent of any such expenses incurred. You and your dependents must notify the Plan of this possibility and must cooperate fully with the Plan in this regard and must do nothing that may prejudice the Plan's rights.
 
 
 12
 This amendment was retroactively effective to October 1, 1991.
 
 
 13
 On July 23, 1986, Nathan Ogan was born with severe neurological damage which resulted in serious and permanent disabilities. His medical expenses were covered by Line Power's employee health benefit plan. In August 1987, the Ogans filed a medical malpractice action on behalf of Nathan against certain medical professionals involved with his birth. The Ogans settled their medical malpractice action for a total of $1,100,000.00 on May 11, 1990. This settlement was divided as follows: 1) $200,000.00 was paid directly to Douglas L. Ogan and Karen E. Ogan; 2) $321,789.77 was approved and allocated for costs and attorneys' fees; and 3) the balance of $578,210.23 was paid to the Sullivan County Court for the benefit of the minor, Nathan Ogan.[1]
 
 
 14
 After receiving notice of this settlement, Electro-Mechanical notified the Ogans that, under the plan's subrogation provision, they were required to reimburse the plan for the costs of the medical expenses which the plan had paid on Nathan's behalf.[2] When the Ogans failed to reimburse the plan, Electro-Mechanical instituted this action, seeking a declaratory judgment as to the validity of its subrogation rights, and requesting full enforcement of those rights against the Ogans. Shortly thereafter, both parties filed Cross-Motions for Summary Judgment. The district court granted Electro-Mechanical's Motion for Summary Judgment and denied the Ogans' Motion for Summary Judgment.
 
 
 15
 The parties have presented two issues on appeal. The first issue is whether the district court erred in finding that the Tennessee Medical Malpractice statute is preempted by ERISA and, therefore, inapplicable to the issues raised in this action. The second issue is whether the district court erred in finding that Electro-Mechanical did not breach its fiduciary duty by failing to provide the Ogans with an explanation of the subrogation clause contained within the new plan, as well as the clause's effect upon any recovery the Ogans might obtain from a third party tortfeasor.
 
 
 16
 Our review of a district court's grant of summary judgment is governed by the same general standards employed by the district court initially. See Hines v. Joy Mfg. Co., 850 F.2d 1146, 1149 (6th Cir.1988) (citing 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2716 (1983); and Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)). Therefore, this Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir.1986). Once the moving party has satisfied the initial burden, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party's failure to "make a sufficient showing to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial" will result in dismissal of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-252, 106 S.Ct. at 2512. The ultimate inquiry is whether there exists any genuine issue of material fact which is disputed. Id. at 248, 106 S.Ct. at 2510. If so, summary judgment dismissal is inappropriate.
 
 
 17
 The Ogans first contend that since the Tennessee Medical Malpractice Act, Tenn.Code Ann. Sec. 29-26-119 (1980), precludes them from recovering Nathan's medical expenses in their malpractice action because his expenses were paid by insurance or self-funded benefits provided by the employer, the settlement proceeds paid by the health professionals did not include any such medical expenses. Therefore, the district court erred in finding that the Tennessee statute, which limited their recovery in their malpractice action, was preempted by ERISA and, therefore, inapplicable to this case. The Tennessee statute upon which the Ogans rely provides:
 
 
 18
 Damages.--In a malpractice action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury, including, but not limited to cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earner income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimants or of the members of the claimants' immediate family and insurance purchased in whole or in part, privately or individually.
 
 
 19
 Tenn.Code Ann. Sec. 29-26-119 (1980) (emphasis added).
 
 
 20
 Under the statute, if the plaintiff's medical expenses are paid by insurance provided by the employer or by any other source except the assets of the plaintiff or his immediate family or by private insurance, the plaintiff may not recover the costs of those medical expenses from the third party tortfeasor. In essence, this statute prohibits a tort plaintiff from receiving a double recovery, once from the medical benefit plan and again from the tortfeasor.
 
 
 21
 In this case, it is undisputed that Nathan Ogan's medical expenses have been and will continue to be paid by Line Power's employee benefit plan by virtue of Douglas Ogan's employment with Line Power. As such, the Ogans contend that the settlement proceeds do not, and, by operation of Tennessee law, could not include the costs of Nathan's medical expenses which were paid by the plan. The Ogans assert that the plan should not be allowed to recoup the costs of Nathan's medical expenses from their settlement proceeds since they were legally precluded by the Tennessee Medical Malpractice Act from recovering those medical expenses from the tortfeasor responsible for Nathan's injuries. Additionally, the Ogans allege that the Tennessee statute is not preempted by ERISA because it does not sufficiently relate to an employee benefit plan so as to fall within ERISA's general preemption provision. 29 U.S.C. Sec. 1144(a) (1988).
 
 
 22
 Three provisions of ERISA specifically address the scope of the Act's intended preemptive effect. The first provision states that Congress intended ERISA to preempt state laws which relate to employee benefit plans:
 
 
 23
 Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....
 
 
 24
 29 U.S.C. Sec. 1144(a) (1988) (emphasis added). The general preemptive effect of subsection (a), however, is specifically limited by subsection (b) of the Act, commonly referred to as the "saving clause:"
 
 
 25
 Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.
 
 
 26
 29 U.S.C. Sec. 1144(b)(2)(A) (1988). Finally, the power which subsection (b) reserves to the states to regulate insurance, banking, and securities is likewise expressly limited by subparagraph (2)(B) of that subsection, commonly referred to as the "deemer clause:"
 
 
 27
 Neither an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.
 
 
 28
 29 U.S.C. Sec. 1144(b)(2)(B) (1988) (emphasis added).
 
 
 29
 In the seminal case of FMC Corp. v. Holliday, 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990), the United States Supreme Court described the application and scope of these provisions:
 
 
 30
 The pre-emption clause is conspicuous for its breadth. It establishes as an area of exclusive federal concern the subject of every state law that "relate[s] to" an employee benefit plan governed by ERISA. The saving clause returns to the States the power to enforce those state laws that "regulat[e] insurance," except as provided in the deemer clause. Under the deemer clause, an employee benefit plan governed by ERISA shall not be "deemed" an insurance company, an insurer, or engaged in the business of insurance for purposes of state laws "purporting to regulate" insurance companies or insurance contracts.
 
 
 31
 In FMC Corp., the Court discussed whether ERISA preempted the application of Pennsylvania's anti-subrogation statute which specifically prohibited an insurer from collecting funds from a plaintiff in satisfaction of its subrogation interest when the plaintiff had been injured and obtained recovery in an action arising out of the maintenance or use of a motor vehicle. Id. at 55, 111 S.Ct. at 406. The Court noted that ERISA's general preemption clause was to be read broadly to preempt any and all state laws which related to, or had a connection or reference with, an employee benefit plan. Id. at 58, 111 S.Ct. at 407 (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)). Emphasizing that such a broad reading of the preemption clause was warranted by the need to ensure that plan administrators were not subjected to conflicting state regulations which would affect and hinder the overall efficiency of the plan's administration process, the Court concluded that under its expansive interpretation of the preemption clause, Pennsylvania's anti-subrogation statute did relate to employee benefit plans and, therefore, was preempted. Id. 498 U.S. at 58-60, 111 S.Ct. at 407-409.
 
 
 32
 In analyzing whether Pennsylvania's statute was "saved" from the effects of the preemption clause by the saving clause and whether it was nonetheless preempted by the deemer clause, the Court drew a clear distinction between ERISA's preemptive effect upon state laws which relate to self-funded employee benefit plans and other employee benefit plans funded by insurance:
 
 
 33
 As a result, self-funded ERISA plans are exempt from state regulation insofar as that regulation "relate[s] to" the plans. State laws directed toward the plans are pre-empted because they relate to an employee benefit plan but are not "saved" because they do not regulate insurance. State laws that directly regulate insurance are "saved" but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws. On the other hand, employee benefit plans that are insured are subject to indirect state insurance regulation. An insurance company that insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance" after application of the deemer clause.... The ERISA plan is consequently bound by state insurance regulations insofar as they apply to the plan's insurer.
 
 
 34
 Id. at 61, 111 S.Ct. at 409. The Court described the impact of this distinction as follows:
 
 
 35
 Our interpretation of the deemer clause makes clear that if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured, the State may not regulate it. As a result, employers will not face " 'conflicting or inconsistent State and local regulation of employee benefit plans.' "
 
 
 36
 Id. at 64, 111 S.Ct. at 411 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 99, 103 S.Ct. 2890, 2901, 77 L.Ed.2d 490 (1983), on remand, 725 F.2d 146 (2d Cir.1983)) (emphasis added).
 
 
 37
 Following FMC Corp., courts have consistently applied this distinction when addressing the ERISA preemption issue. See generally Provident Life and Accident Ins. Co. v. Linthicum, 930 F.2d 14, 16 (8th Cir.1991) ("[T]he Supreme Court reaffirmed the breadth of its prior ERISA pre-emption cases and specifically held that ERISA applied to self-funded benefit plans and pre-empted application of a state anti-subrogation law."); Thompson v. Talquin Bldg. Prod. Co., 928 F.2d 649, 652 (4th Cir.1991) ("Thus, so long as the Plan can be categorized as self-funded, state law cannot regulate it."); Blue Cross and Blue Shield of Ala. v. Lewis, 754 F.Supp. 849, 851-852 (N.D.Ala.1991); Allstate Ins. Co. v. Michigan Carpenters' Council Health & Welfare Fund, 760 F.Supp. 665, 668 (W.D.Mich.1991) ("The Supreme Court held that ... [ERISA] preempts all state regulation of self-funded ERISA employee welfare benefit plans."); Buchman v. Wayne Trace Local Sch. Dist. Bd. of Educ., 763 F.Supp. 1405, 1409 (N.D.Ohio 1991) ("... [S]uch a statute is clearly preempted by ERISA under the Supreme Court's recent ruling in FMC v. Holliday, supra, as long as the plan at issue is indeed, self-funded.").
 
 
 38
 ERISA's preemption provision was intended to preempt all state laws which relate to self-funded employee benefit plans. The Court finds that the Tennessee Medical Malpractice Act sufficiently relates to the self-funded employee benefit plan in this case so as to fall within ERISA's general preemption provision. The Tennessee statute has a direct economic impact upon the plan by effectively precluding it from recovering its subrogation interest from the Ogans despite the explicit subrogation rights conferred by the plan's language. If the plan were required to comply with the Tennessee statute, it would be subjected to inconsistent obligations in states with different medical malpractice and subrogation statutes. This is the exact type of situation which ERISA's broad preemption scheme was created to avoid:
 
 
 39
 To require plan providers to design their programs in an environment of differing State regulations would complicate the administration of nationwide plans, producing inefficiencies that employers might offset with decreased benefits.... Thus, where a "patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation," we have applied the preemption clause to insure that benefit plans will be governed by only a single set of regulations.
 
 
 40
 FMC Corp., 498 U.S. at 60, 111 S.Ct. at 408 (quoting Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 10-11, 107 S.Ct. 2211, 2216-2217, 96 L.Ed.2d 1 (1987)).
 
 
 41
 Even if the Tennessee statute is saved from ERISA's general preemption clause by the saving clause, it is nonetheless preempted by the deemer clause. Under the explicit holding of FMC Corp., "self-funded ERISA plans are exempt from state regulation insofar as that regulation 'relate[s] to' the plans." Id. 498 U.S. at 61, 111 S.Ct. at 409.
 
 
 42
 The Ogans next contend that Electro-Mechanical should not be able to rely upon the plan's subrogation provision to collect funds from their settlement proceeds because it breached its fiduciary duty to explain to them the meaning and significance of the subrogation provision. ERISA defines the fiduciary duties imposed upon a plan's administrator as follows:
 
 
 43
 (a)(1) ... [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
 
 
 44
 (A) for the exclusive purpose of:
 
 
 45
 (i) providing benefits to participants and their beneficiaries; and
 
 
 46
 (ii) defraying reasonable expenses of administering the plan;
 
 
 47
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....
 
 
 48
 29 U.S.C. Sec. 1104(a)(1)(A)-(B) (1988). In addition, ERISA requires the employer to prepare and distribute an employee information booklet which specifically and simply describes the plan's provisions:
 
 
 49
 A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries.... The summary plan description ... shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan ... shall be written in a manner calculated to be understood by the average plan participant....
 
 
 50
 29 U.S.C. Sec. 1022(a)(1) (1988). The Ogans assert that, by amending the plan to add a subrogation provision which did not previously exist and by failing to explain the meaning of the term "subrogation" to Douglas Ogan, Electro-Mechanical failed to act with the care and diligence which the objectively reasonable person would have employed, and should not now be allowed to rely upon the subrogation provision to reduce their settlement award.
 
 
 51
 Under ERISA, plan fiduciaries are required to "provide employees with a comprehensive explanation of the contents of the plan." Allen v. Atlantic Richfield Retirement Plan, 480 F.Supp. 848, 851 (E.D.Penn.1979), aff'd, 633 F.2d 209 (3rd Cir.1980). The fiduciary may satisfy this obligation by distributing amongst employees an explanatory booklet which adequately explains the plan and its terms. Id. In addition, ERISA imposes a duty upon fiduciaries to respond promptly and adequately to employee-initiated inquiries regarding the plan or any of its terms. See Hopkins v. FMC Corp., 535 F.Supp. 235, 240 (W.D.N.C.1982); see also Lee v. Union Elec. Co., 606 F.Supp. 316, 321 (E.D.Mo.1985), aff'd, 789 F.2d 1303 (8th Cir.1986), cert. denied, 479 U.S. 962, 107 S.Ct. 460, 93 L.Ed.2d 406 (1986). Absent a specific employee-initiated inquiry, however, a fiduciary is not obligated to seek out employees to ensure that they understand the plan's provisions as described in the explanatory booklet. Hopkins, 535 F.Supp. at 239; Lee, 606 F.Supp. at 321.
 
 
 52
 It is undisputed that Douglas Ogan received from Line Power both the August 1988 Plan and the amended October 1, 1991 Plan. He was responsible for distributing the 1988 and 1991 plan booklets to other employees, and normally retained copies of the current plan on his desk for reference purposes. The record indicates that Mr. Ogan had occasions when he, as a supervisor, received questions from other employees about the plan, and was responsible for giving or seeking answers to these questions concerning the plan. Finally, it is undisputed that Mr. Ogan never asked his employer for advice or guidance regarding the terms of the plan, or otherwise notified his employer that he was confused regarding the subrogation provision. If the Ogans were confused as to the meaning of the term "subrogation," it was their obligation to notify the employer of their confusion, and to inquire as to the intended meaning of the term and its impact upon their case. The Ogans' failure to inquire or otherwise eliminate their own confusion does not constitute a breach of Electro-Mechanical's fiduciary duties under ERISA.
 
 
 53
 For the foregoing reasons, the district court's decision to grant Electro-Mechanical's Motion for Summary Judgment is hereby AFFIRMED.
 
 
 
 *
 The Honorable Robert L. Echols, United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 Subsequently, Hamilton Bank of Upper East Tennessee was named special guardian for Nathan, and was responsible for managing and monitoring the funds allocated to Nathan pursuant to the terms of the settlement agreement
 
 
 [2]
 As of the filing of Electro-Mechanical's Motion for Summary Judgment, Nathan's medical expenses totaled $139,783.70, and he will continue to incur future medical expenses, for which Electro-Mechanical will be obligated to pay