**WATERS CORPORATION** and **Philip Taymor, Brian K. Mazar** and **Douglas M. Berthiaume, Individually and as Trustees of the Waters Retirement Plan, Plaintiffs,**

v.

**MILLIPORE CORPORATION, the Retirement Plan Committee, Jeffrey D. Gard, Patricia Powers, Robert Tunsmeire, Geoffrey Nunes, Michael Carroll, and Retirement Plan for Employees of Millipore Corporation (as a Nominal Defendant), Defendants.**

No. CIV. A. 96–11011–DPW.

United States District Court,
D. Massachusetts.

May 23, 1997.

Kevin W. Clancy, Cooke, Clancy & Gruenthal, Boston, MA, Jean Reed Haynes, Peter A. Bellacosa, Kirkland & Ellis, New York City, for Plaintiffs.

John T. Montgomery, Thomas P. Smith, Ropes & Gray, Boston, MA, for Defendants.

## MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

In 1994 when Waters Corporation bought the chromatography division of the Millipore Corporation, the two companies entered into a purchase and sale agreement which included a number of conditions precedent. Among those conditions was a provision which required that Waters set up a pension program to replace the existing Millipore pension program in order to cover all employees who were transferring from Millipore to Waters. At the same time, Millipore was obligated to transfer from its pension program to the new Waters pension program assets sufficient to cover the liabilities for the transferring employees. After the assets and liabilities associated with this pension program transfer transaction were calculated by Millipore, Waters complained that the assets were insufficient to cover the pension program's liabilities, in violation of the purchase and sale agreement, as well as ERISA and the Internal Revenue Code ("IRC"). Waters filed this suit in order to compel Millipore to recalculate the program's liabilities and therefore transfer what Waters considers to be the appropriate amount to the new Waters pension program. Before me are cross motions for summary judgment.

## I. Background

Millipore sponsors two pension plans for its employees—the Millipore Corporation Employees' Participation and Savings Plan ("MPP") and the Retirement Plan for Employees of Millipore Corporation ("MRP") (the MRP and the MPP combined will be collectively referred to as the Millipore Plans). (Powers Affidavit, ¶ 1.)

Millipore established an MPP in 1958 as a defined contribution profit sharing plan. (Powers Affidavit, ¶ 2; Complaint, ¶ 17.) Millipore contributes on behalf of its employees to the MPP. (Powers Affidavit, ¶ 3.) An MPP account balance is expressed as a lump sum dollar amount.

In 1980, Millipore established the MRP as a defined benefit plan in order to supplement the MPP. (*Id.* at ¶ 5.) The MRP states that its purpose is to provide employees with a minimum level of retirement income benefits (referred to as the "gross benefit") in the event that the benefits from the MPP are inadequate. (MRP, § 1.1.) The minimum benefits under the MRP are stated in terms of a dollar amount per month.

The MRP is considered a "floor plan" which is designed to provide for a minimum level of benefits to participants. (Powers Affidavit, ¶ 5.) The combined Millipore Plans are commonly called a "floor offset plan." If a participant's MPP account balance is insufficient to provide for the minimum floor benefit, the MRP will pay the deficient amount (referred to as the "net benefit") in order to ensure that the participant receives the gross benefit due. (*Id.;* Rafiee Affidavit, ¶¶ 6, 7.)

Because an employee's MPP account is stated in terms of a lump sum dollar amount while the MRP defined gross benefit is expressed in terms of a dollar amount per month, the MRP provides a formula for converting the MPP account balance into a monthly annuity in order to determine whether the MPP account balance is sufficient to provide at least the gross benefit due under the combined Plans. (Rafiee Affidavit, ¶ 8.)

Millipore has a Retirement Plan Committee (the "Committee") which is a fiduciary, as well as the plan administrator, of the Plans. The Committee consists of five members and its duties and rights are defined under § 12 of the MPP and § 8 of the MRP. It is primarily charged with overseeing, interpreting and applying the Plans. A number of the individual defendants in this action are or were Committee members.

Millipore has amended both Plans from time to time since first implemented. (Powers Affidavit, ¶¶ 4, 7.) Millipore issues and distributes to participants Summary Plan Descriptions (SPDs) for both Plans. (Beland Affidavit, ¶ 4.)

### A. Payment Under the Millipore Plans [1]

When a participant in the Millipore Plans leaves the company, he or she has a number of options. Section 8.5 of the MPP describes the available methods of payment. The employee may take his or her account balance as a lump sum. (MPP, § 8.5(b).) Alternatively, if the employee meets the requirements of § 7.4, he or she may transfer the entire account balance required to provide the amount of the floor gross benefit to the MRP to purchase such an annuity. (MPP, § 8.5(c).) If the MPP account balance is larger than the amount needed to provide the gross floor benefit under the MRP, the remaining account balance after the initial transfer may "be used for the purchase of a second annuity or be paid to the Participant in a lump sum in cash." (*Id.*)

Section 4.1 of the MRP defines Normal Retirement Benefits ("NRB"). This section defines the NRB under two alternative circumstances—(a) when the participant transfers an MPP account balance from the MPP to the MRP; and (b) when the participant chooses to take a lump sum payment under the MPP and does not transfer any funds to the MRP. (MRP, § 4.1.)

If the participant chooses to transfer his or her MPP account balance to the MRP, the NRB is a monthly annuity equal to the amount calculated under subsection (a) of

---

**1.** All references to the Millipore Plans' provisions in this section, unless otherwise noted, will be to the 1994 Restatements of the Plans.

§ 4.1, which is equivalent to the minimum floor benefit, also called the gross benefit, provided by the MRP.

If the participant chooses to receive a lump sum under the MPP, the NRB is calculated under subsection (b) of § 4.1, which is the minimum monthly floor benefit minus the monthly annuity determined to be the actuarial equivalent of the MPP account balance as provided in the appendix to the MRP. In other words, the NRB is the difference between the monthly payment the lump sum would provide and the minimum benefit the MRP requires, also referred to as the net benefit. If the lump sum would provide a monthly benefit higher than the floor benefit, the NRB is zero, but if the lump sum would provide a monthly benefit lower than the floor benefit, the NRB is whatever monthly amount would be necessary to make up the difference.

Section 5.1 of the MRP provides that the normal form of payment under the MRP is an annuity. Section 5.2 lists various optional forms of payment, including a variety of forms of annuities and a lump sum. Section 5.2(e) of the MRP provides that the Committee, with the consent of the participant, shall "distribute to a Participant a lump sum in cash equal to the Actuarial Equivalent of his Accrued Benefit." The MRP defines "Accrued Benefit" as "the retirement benefit to which a Participant shall be entitled commencing at his Normal Retirement Date as determined in accordance with the Plan, and based on the Participant's Service, Final Average Compensation and Account Balance as of the date of determination." (MRP, § 2.2.)

The MPP SPD [2] states that a participant will receive his or her account balance as a lump sum, but that if he or she meets certain requirements, he or she "may elect to transfer the balance in your Participation Account in to the [MRP]. This will enable you to receive your retirement benefits in the form of a Joint and Survivor Annuity. If you are married and your spouse has waived his or her right to your benefits, then you may

select another form of annuity payment." (MPP SPD at 6 (Def.'s Appendix page A339).)

The MRP SPD states that the normal form of payment is as an annuity. (MRP SPD at 7 (Def.'s Appendix page A359).) In that same description of payment of benefits, the SPD states that "[t]he balance in your [MPP] account is ordinarily paid in the form of one lump sum cash payment. However, if you are age 55 or over and have completed ten years of service with Millipore, you may elect to transfer the balance in your [MPP] account into the [MRP]. This will enable you to receive your retirement benefits in the form of a Joint and Survivor Annuity if you are married or Single Life Annuity if you are unmarried. If you are married and your spouse has waived his or her right to your benefits, then you may select another form of annuity payment. If you are unmarried, you may elect to receive your benefit payments in another form if you have done so in writing." (MRP SPD at 9 (Def.'s Appendix page A361).)

Another version of the MRP SPD describes this option using slightly different language. This version states that "[t]he balance in your [MPP] account is ordinarily paid in the form of one lump sum cash payment. However, if you retire on or after age 65 with a minimum of five years of service, take early retirement, or leave Millipore prior to retirement with at least 10 years of service, you may elect to transfer the balance in your [MPP] account into the [MRP]. This enables you to receive your entire retirement benefits in the form of any of the payment options mentioned previously." (MRP SPD at 10 (Def.'s Appendix page A376).)

The Pension Benefit Guaranty Corporation ("PBGC") establishes the factors which must be used to convert an annuity form of benefit into a lump sum form of benefit. When calculating an annuity into a lump sum under the MRP, the PBGC factors are used.

**2.** The SPDs provided by the parties are not dated. The record includes multiple copies of the SPDs, with slight variations in phrasing. Because the Plan documents, not the SPDs, control, I refer to the SPDs simply to identify what the

plan beneficiaries were told regarding the provisions. Despite the modest language variations among the SPDs, the parties do not urge that the issues in this case turn on the particulars of the various SPD phrasings.

(MRP, § 5.2(e).) When calculating a lump sum from the MPP to an annuity under the MRP, the assumptions set out in the Appendix to the MRP are used. (*Id.*) Depending on the then current interest rate, these factors can provide for different results.

### B. *Early Retirement Payments*

Section 4.2 of the MRP provides for Early Retirement Benefits to certain qualifying employees. An employee who retires between age 62 and 65 who has completed 10 years of service as of his or her retirement date is entitled to receive an Early Retirement Benefit without actuarial reduction reflecting his or her early retirement. (MRP, § 4.2(a).) An employee who retires between age 55 and 62 may either receive the full Early Retirement Benefit beginning at his Normal Retirement Date or receive reduced benefits beginning immediately, with benefits being actuarially reduced only from age 62. (*Id.* at § 4.2(b).)

### C. *Millipore Communications with Participants*

Millipore's standard practice is to provide new employees with information concerning available benefits, including SPDs for the Plans. (Beland Affidavit, ¶ 4.) As SPDs are updated, participants receive copies of the new SPDs. (*Id.*) Millipore also holds occasional seminars to answer participant questions concerning benefit programs. (*Id.*) Plan documents for the MPP and MRP are provided to any participant who requests a copy. (*Id.*) Evon Beland, the manager of benefits at Millipore, and her staff are available to answer questions regarding the Plans. (*Id.* ¶ 6.)

When a participant retires, he or she has a meeting with Beland or one of her staff members to review options under the MRP and MPP. (*Id.* at ¶ 6.) At this meeting, the employee is given a printout showing the MPP account balance, any net benefit available from the MRP, and the monthly amounts available under various annuity options if the employee chooses to transfer his or her MPP account balance to the MRP. (*Id.*) It is policy for the participant to be told in this meeting to take the information provided and seek financial advice from a CPA or financial advisor. (*Id.* at ¶ 9.) It is also

policy not to provide any advice on whether a particular option is more "valuable" than another or any suggestion as to which option a particular employee should choose. (*Id.*)

### D. *The Waters Transaction and Ensuing Litigation*

In March, 1994, Millipore and Waters entered into negotiations for Millipore to sell its chromatography division to Millipore. (Powers Affidavit, ¶ 16.) The employees in the chromatography division at Millipore comprised approximately one-third of the total number of participants in the Millipore Plans. (Beland Affidavit, ¶ 2.)

The Agreement between Waters and Millipore required that Millipore transfer assets equal to MPP account balances for the transferred employees from the MPP into a replacement contribution plan which Waters would establish and that Millipore would transfer assets in an amount equal to the projected benefit obligation (PBO) for the transferred employees from the MRP to a replacement defined benefit plan which Waters would establish.

Section 8.8 of the Purchase and Sale Agreement states that:

(iii) ... Millipore shall cause assets to be transferred from the Retirement Plan to the Replacement Defined Benefit Plan in accordance with the requirements of Section 414(1) of the Code...

(iv)The amount of assets transferred from the Retirement Plan shall be equal to the Projected Benefit Obligation ("PBO"), whether or not vested, as determined in accordance with the Financial Accounting Standards Board Statement 87 ("FAS 87") and which is attributable to the Transferred Employees who are participants in the Retirement Plan as of the Closing Date. For purposes of the preceding sentence, determination of the PBO shall be calculated in accordance with the actuarial assumptions set forth in the January 1, 1994 determination of pension expense actuarial valuation report prepared by the Wyatt Company.... The above-described calculation of the amount to be transferred from the Retirement Plan to the Replacement Defined Benefit Plan shall be made

by the Wyatt Company and, at the Purchaser's option, reviewed by Towers Perrin. . . .

Section 414(1) of the IRC and § 208 of ERISA contain essentially the same requirement that upon transfer of assets a plan would not qualify "unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated)." 26 U.S.C. § 414(1); 29 U.S.C. § 1058.

In October, 1994, Millipore transferred approximately $27 million from the MPP to the Waters replacement participation plan. (Powers Affidavit, ¶ 19.) On March 10, 1995, the Wyatt Company, pursuant to § 8.8(iv) of the Agreement, calculated the PBO amount to be transferred from the MRP to the Waters replacement retirement plan to be $1,890,328. (*Id.*) Disputing that figure, Waters filed a demand for arbitration on August 17, 1995. (*Id.* at ¶ 20.) Waters challenged the actuarial assumptions Wyatt used and claimed that Millipore failed to value the PBO of the MRP correctly, asserting that the transfer amount due was approximately $11 million. (*Id.*)

Millipore responded by filing an action in Massachusetts Superior Court to stay the arbitration. (Smith Affidavit, ¶ 4.) The Superior Court stayed and enjoined the arbitration. (*Id.*) On April 19, 1995, Millipore moved for summary judgment in the Massachusetts action. (*Id.* at ¶ 5.)[3]

In 1996, the Committee reviewed and discussed Waters' interpretation of the Plans and expressly concluded that Waters' reading was incorrect. (Powers Affidavit, ¶ 26.) After numerous discussions, the Committee formally voted to reject Waters' proposed interpretation of the Plans on November 4,

1996. (*Id.*) In September, 1996, spurred by the Waters interpretation of the Plans, the Committee amended the Plans in order to eliminate confusion or doubt. (*Id.* at ¶ 27; Def.'s Exhibits C & F.)

On May 15, 1996, Waters filed the instant action seeking declaratory judgment as to the appropriate benefits available under the Millipore Plans; injunctive relief requiring that Millipore transfer the appropriate funds to Water's replacement retirement plan; and declaratory judgment that the defendants had breached their fiduciary duties to participants by failing to administer the Plans in accordance with their terms and by failing to provide complete and accurate information to participants. (Complaint, 16–17; Memo. in Support of Plaintiffs' Motion for Partial Summary Judgment, 2–3.) Before me are the parties' cross-motions for summary judgment.

## II.  Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

## III.  Scope of Review Over Committee's Actions

ERISA was enacted in 1974 in order "to protect . . . the interests of participants in

---

**3.** At oral argument, the parties explained that the state litigation involved issues of contract interpretation, specifically whether under § 8.8(iv) of the Agreement Millipore transferred to Waters funds equal to the PBO. By contrast, § 8.8(iii) requires transfer in accordance with § 414(1) of the IRC. The parties suggest that the only issue before the state court is whether the contract

terms governing calculation of the PBO were satisfied and that the question of whether § 414(1) requirements were met is separately at issue here. Whether there is or could be any identifiable or practical difference between the requirements of § 8.8(iv) and § 8.8(iii) remains unclear.

employee benefit plans...." 29 U.S.C. § 1001(b). Congress was also concerned with "assur[ing] the equitable character of [benefit plans] and their financial soundness." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 570, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985). In order to address such concerns, ERISA mandates certain standards for plans which employers establish, *see e.g.,* 29 U.S.C. § 1053, and sets strict duties and obligations for the fiduciaries with respect to them. *See e.g.,* 29 U.S.C. § 1104.

Before reaching the substance of Waters' claims and analyzing the Plans and the Committee's actions, I initially must address the standard for judicial review. Waters contends that I should apply the prudent person standard to analyze the Committee's actions *de novo,* while Millipore contends that my review should be based on an arbitrary and capricious standard. Some discussion of prior case law will be useful.

In *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325 (3d Cir.1984), the Third Circuit declined to apply the arbitrary and capricious standard. The plaintiffs there charged the trustees with breaching their fiduciary duties under ERISA by failing to collect employer contributions to the plan and by applying surpluses to benefit the employers rather than the retirees. The Third Circuit evaluated the claim that a trustee had failed to act in the interest of the beneficiaries *de novo* subject to the prudent person standard. *Id.* at 333–34.

In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court addressed the standard of review governing claims for benefits under 29 U.S.C. § 1132(a)(1)(B). The Supreme Court looked to the common law of trusts for guidance. *Id.* at 110. The Court stated that a deferential standard of review is appropriate where the benefit plan gives "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. The Court expressly limited its holding to actions under § 1132(a)(1)(B) challenging de-

nials of benefits based on plan interpretations. *Id.* at 108.

Relying on *Firestone's* limiting language, a number of courts have declined to apply the arbitrary and capricious standard of review to ERISA cases beyond those making a claim for benefits when the fiduciary has been given discretionary powers under the plan. *See Ches v. Archer,* 827 F.Supp. 159 (W.D.N.Y.1993); *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan,* 26 F.3d 360 (2d Cir.1994); *see generally Moench v. Robertson,* 62 F.3d 553 (3d Cir.1995), (arbitrary and capricious standard appropriate when dealing with discretionary reading of plan; in absence of actual interpretive effort by Committee *de novo* review employed), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996).

The First Circuit in *Mahoney v. Board of Trustees,* 973 F.2d 968 (1st Cir.1992), used a similar method to determine the standard of review over trustee action increasing unevenly the size of retirement pensions to longshoremen who had retired and longshoremen who were still working. The court noted that the parties agree that "ordinarily a court, in deciding whether trustees have violated the common law-based fiduciary obligations that ERISA imposes, 29 U.S.C. § 1104, will simply ask whether their decisions are 'arbitrary and capricious in light of the trustees' responsibilities to all potential beneficiaries.'" 973 F.2d at 970 (*citing Cleary v. Graphic Communications Int'l Union Supplemental Retirement and Disability Fund,* 841 F.2d 444, 449 (1st Cir.1988); *Firestone,* 489 U.S. at 110). The plaintiffs, relying on *Struble,* argued that because several of the trustees were themselves working longshoremen who benefitted personally from their decision, the court should apply an especially strict standard of review. *Id.* The First Circuit decided, however, to apply an arbitrary and capricious standard. *Id.* at 971. That determination was based on a variety of factors: the guidance of ordinary trust law, special considerations because the pension plan was also subject to the LMRA, and the fact that the dispute at issue involved conflicts among the interests of different

beneficiaries, not the interests of beneficiaries and a non-beneficiary, which might call for a stricter standard of review. *Id.* at 971–72.

Other courts have expressly extended the arbitrary and capricious standard of review beyond those claims for benefits under *Firestone* to circumstances in which discretion has been conferred upon the trustee with respect to the specific action being challenged. In *Ganton Technologies, Inc. v. National Industrial Group Pension Plan,* 76 F.3d 462, 466 (2d Cir.1996), for example, the court held that because the plan documents gave the trustees of a multi-employer plan the discretion to interpret plan terms, when one employer and contributor challenged whether or not the trustees had given "individualized determination" to an employer's request to withdraw, the court would not substitute its judgment for the trustees' unless their interpretation of this term in the policy was arbitrary and capricious. *See also DiGiovannantonio v. Local 153 Pension Fund,* 1993 WL 37514, at *2 (E.D.Pa.1993).

Both Millipore Plans grant the Committee discretion to interpret and construe the terms of the Plans. The relevant sections of each Plan are identical in the discretion they give to the Committee and state:

> The Committee shall have full power to administer the Plan in all of its details, subject, however, to the requirements of ERISA. For this purpose, the Committee shall have the powers and duties specified in . . . the Plan, and not in limitation but in amplification of the foregoing, shall have the following authority:
>
> (a) to make and enforce such rules, regulations, determinations and guidelines as it deems necessary or proper for the efficient administration of the Plan, . . .

> (b) to interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons including without limitation the Company, Employees, former Employees, Participants, former Participants and Beneficiaries;
>
> (c) to decide all questions concerning the Plan, including questions concerning the eligibility of any individual to participate in the Plan and questions submitted to it by the Trustees on any matter to enable them to properly discharge their duties under the Plan;
>
> (d) to determine the person or persons to whom benefits will be paid in accordance with the provisions of the Plan and the amount of such benefits, its determination thereof to be final, with payment pursuant to such determination constituting a complete discharge of all obligations on account of such benefits; . . .

(MRP, § 8.2; MPP § 12.2.) These provisions clearly provide the Committee with discretion to interpret the provisions of the Plans independent of its discretion to decide questions relating to the payment of benefits under the Plans. As such, the case law would indicate that the arbitrary and capricious standard of review is applicable because discretion is explicitly provided in the Plans, although the First Circuit has not addressed a case in this situation.

Waters argues that the Committee has a conflict of interest in that its interpretation of the Plans saves the company money and that therefore a stricter standard of review—a heightened arbitrary and capricious review—should apply. Every decision to limit benefits, of course, saves money for the company when the company contributes to the plan. Here, the interpretation Millipore supports may save the company money,[4] but,

---

4. There is a suggestion in the plaintiffs' memoranda that by not informing the participants of this purported profit or subsidy opportunity the trustees are benefitting Millipore by reducing the benefits paid and therefore saving the company money. Almost any claim under ERISA in which the company contributes to the plan corpus can be said to involve such a conflict between beneficiaries and a non-beneficiary—the

company—because the company saves money if the plan limits benefits in some manner, either to an individual or to all the beneficiaries through interpretation of the plan. This circumstance can of itself hardly bar application of the arbitrary and capricious standard. To hold otherwise would mean that virtually every decision under ERISA would be reviewed *de novo,* which

more importantly, it would seem to preserve the financial well-being of the Plan against unanticipated interpretations for which funding was not provided—although it is demanded now in the transfer mode. This policy determination essentially involves a balancing of the interests among various participating employees. *See Ganton*, 76 F.3d at 467 (citations omitted).

The circumstances of this case do not neatly fall into any of the categories addressed in the case law to date. While the actions in question do not pit one beneficiary against another, neither do they directly pit the beneficiaries against a non-beneficiary. The factors evaluated by the courts do not all neatly align to mandate a particular standard of review as preferable to another. While I believe that the discretion plainly provided to the Committee in interpreting Plan terms would compel the First Circuit to apply an arbitrary and capricious standard of review, background questions surrounding conflict of interest create some uncertainty. It is not completely clear what standard the First Circuit would choose to apply to either claim in this case.[5]

After reviewing the motions, I have come to the conclusion that the same result is warranted under any of the available standards of review. Therefore, having outlined the issue I do not find it necessary to decide definitively which standard of review is applicable and instead review the claims under the most stringent standard—*de novo* review using a prudent person standard—in evaluating the plaintiff's claims.

## IV. Application of Standard to Waters' Claims

Section 404(a)(1) of ERISA sets out the prudent person standard of care which governs fiduciaries. This provision states that:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ...

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1).

A trustee commits a breach of trust when he or she "intentionally or negligently do[es] what he ought not to do or fail[s] to do what he ought to do." *Oscar A. Samos, M.D., Inc. v. Dean Witter Reynolds, Inc.*, 772 F.Supp. 715, 719 (D.R.I.1991) (*quoting* Restatement (Second) of Trusts § 201 comment a).

### A. Interpretation of Plan Terms

In interpreting ERISA plans, the First Circuit instructs courts to employ both contract and trust principles. *Allen v. Adage, Inc.*, 967 F.2d 695, 698 (1st Cir.1992) (citations omitted).

It is a general rule that "where one contract refers to and incorporates the provisions of another both shall be construed together." *Chicago Pneumatic Tool Co. v. Ziegler*, 151 F.2d 784, 795 (3d Cir.1945); *Zanditon v. Feinstein*, 849 F.2d 692, 700 (1st Cir.1988)(outlining Massachusetts rules of

---

is clearly not the thrust of *Firestone* or the related lower court case law.

**5.** In addition to the interpretation claim, Waters asserts that the Committee breached its fiduciary duty under § 404 of ERISA by failing to provide complete and accurate information concerning the Millipore Plans. In providing participants with plan information, the trustees are furthering a goal of ensuring that participants are informed of their rights and potential benefits under the plan in question. Waters is not contending that some participants were provided with full information while others were not, thereby creating bias in favor of one group of employees over another. This claim is one which requires *de novo* review, an exercise I undertake in Part I.V.A.4. (b) of this Memorandum.

contract interpretation). Consequently, I will read the MPP and MRP together because they cross-reference each other throughout and were plainly intended to work together to create one comprehensive pension program.

■ A contract should also be interpreted in a manner which avoids resulting in meaningless words. *Gibraltar Financial Corp. v. Lumbermens Mutual Casualty Co.,* 400 Mass. 870, 872, 513 N.E.2d 681 (1987). When the language of the contract is clear and unambiguous, however, the plain meaning should control. *Sisters of the Third Order of St. Francis v. SwedishAmerican Health Benefit Trust,* 1989 WL 57816 at *3 (N.D.Ill.1989), *aff'd,* 901 F.2d 1369 (1990). A phrase or term which "is susceptible to differing, but nonetheless plausible, constructions, depending in part on the context in which it is used, is ambiguous." *Id.,* at 700 (citations omitted). Whether or not a contract term is ambiguous is a question of law. *Allen,* 967 F.2d at 698.

■ When a plan provision is ambiguous, the court should interpret the plan "in light of its apparent purposes, its structure and its history." *Bachelder v. Communications Satellite Corp.,* 837 F.2d 519, 522 (1st Cir.1988) (citations omitted). In clarifying ambiguities in plans the First Circuit has also looked to construe the language of the plan " 'as interpreted in light of all the circumstances and such other evidence of the intention of the settlor ... as is not inadmissible,' " *Allen,* 967 F.2d at 701 (*quoting Firestone,* 489 U.S. at 112), such as ordinary usage, the realities of commerce and past practice. *Id.* at 702–03.

■ Here, Waters contends that the Plans, as written, provide not only for the benefits which Millipore acknowledges, but also for certain "subsidies" available through a series of steps which provide additional monies to the participants.

### 1. The Waters' Reading

According to Waters, the Millipore Plans create two subsidies which must be considered in calculating the amount of assets to be transferred to the new Waters plans. The first is what Waters defines as a Lump Sum Subsidy, while the second is referred to as an Early Retirement Subsidy. Both of these subsidies in turn create what Waters refers to as liabilities under the terms of the Agreement, ERISA and the IRC, that must be taken into account in the transfer of assets.

Waters' reading of the Plans is as follows. Section 8.5(c) of the MPP allows an employee to transfer his or her MPP account balance to the MRP if the requirements of § 7.4 of the MPP are met. Section 4.1 of the MRP defines "Normal Retirement Benefit" under the MRP, with option "a" applying when the employee transfers his or her MPP account balance to the MRP and option "b" applying when the employee does not transfer any funds into the MRP. Section 2.2 of the MRP defines "Accrued Benefit" as the "retirement benefit to which the participant shall be entitled commencing at his Normal Retirement Date as determined in accordance with the Plan, ..." Therefore, the "Accrued Benefit" for employees who transfer balances from the MPP to the MRP would be the Normal Retirement Benefit as defined in § 4.1(a) (which Waters also refers to as the gross benefit).

Section 5.1 of the MRP states that the Normal Form of Payment is an annuity. Section 5.2 lists various Optional Forms of Payment, with § 5.2(e) providing for a Lump Sum Option. Section 5.2(e) states that "[t]he Committee shall with the consent of the Participant and in lieu of any other optional form of benefit payable under this Section 5.2 distribute to a Participant a lump sum in cash equal to the Actuarial Equivalent of his Accrued Benefit; ..."

According to Waters, the term Accrued Benefit as used in § 5.2 would refer to the gross benefit for those who transfer their MPP account balance to the MRP and the net benefit for those who choose not to transfer any amounts to the MRP. Therefore, § 5.2(e) would require Millipore to pay the entire gross benefit in the form of a lump sum to an employee who transfers his or her MPP account balance to the MRP under § 8.5(c) of the MPP.

Waters' reading of the Plans would allow for the following hypothetical claim. An employee, age 65, is retiring. Assume that the gross benefit for the employee under the MRP would be $1,500 per month and the employee had accumulated $100,000 in his MPP account, which would convert into a $1,000 per month annuity using the calculation set out in the MRP. Under the standard terms of the Plans, the employee would receive a lump sum payment of $100,000 at age 65 from the MPP and then begin receiving a $500 per month annuity from the MRP to make up the difference between his MPP account balance and the minimum floor benefit provided for in the MRP. This $500 per month annuity would be the Accrued Benefit as defined in the MRP.

If the employee transferred his MPP account balance to the MRP, he would then, under the basic terms of the MRP, receive a $1,500 per month annuity from the MRP. The Accrued Benefit would, in this case, be the $1,500 per month annuity.

According to Waters, the employee could then immediately turn around and take this $1,500 per month annuity and convert it back into a lump sum under § 5.2(e) of the MRP, using the PBGC formula, which differs from the formula used to convert the lump sum of the MPP into an annuity under the MRP. Since the interest rate of the PBGC is currently lower than the conversion rate used in the MRP formula, this would result—as a consequence of interest rate arbitrage—in the $1,000 portion of the annuity converting back to a lump sum greater than in the original $100,000 in the MPP account. *See* Rafiee Certification, ¶¶ 10–12, 21–23. This difference is what Waters refers to as the Lump Sum Subsidy.

The Early Retirement Subsidy is created, according to Waters, by the following sequence. Section 4.2 of the MRP provides for early retirement for employees between age 62 and 65 who have completed 10 years of service. The section provides a subsidy because it does not actuarially reduce the annuity calculated even though it begins paying the annuity at an earlier age. Employees between age 55 and 62 are given the option of receiving full benefits beginning at age 62

or receiving a reduced benefit beginning immediately, with the amount actuarially reduced from age 62. This results in a subsidy in that there is no actuarial reduction for the period from age 62 to 65.

Using the previous hypothetical and applying it to an employee who wishes to retire at age 62, Waters concludes that the Early Retirement Benefit results in a 62 year old with an MPP balance of $100,000 receiving an annuity with a net present value of over $150,000 in exchange. *See* Rafiee Certification ¶ 19. This benefit results in what Waters refers to as the Early Retirement Liability.

Waters asserts that Millipore's actuaries, in determining the assets to be transferred under the Agreement did not recognize the Lump Sum Liability and the Early Retirement Liability, resulting in a significant undervaluation of the transfer amount.

### 2. The Millipore Reading

Millipore contends that Waters' reading is too narrow and selective and does not harmonize with the other terms in the MRP or the proper combined reading of the Plans as a whole.

The stated purpose of the MRP is to "[p]rovide Participants who retire from the Company with an assured minimum level of retirement income benefits which shall be payable from the Plan *in the event and to the extent that the benefits provided by a Participant's Account Balance in the [MPP] are inadequate to provide the actuarial equivalent of the minimum benefit provided by the Plan.*" MRP, § 1.1 (emphasis added). According to Millipore, the suggestion that a participant could obtain the Lump Sum Subsidy, which would have the MRP not just provide minimum guaranteed benefits, but also provide extra unanticipated sums of money by mere manipulation of different formulas and varying interest rates, clearly ignores the stated purpose of the MRP.

In addition, § 4.1 of the MRP which provides for the calculation of Normal Retirement Benefits, states that "if [the participant] irrevocably transfers his Account Balance to the Trust Fund for payment of

retirement *benefits* under the Plan, then calculation (a) would be used." (emphasis added.) This reference to benefits in the plural is, according to Millipore, an indication that a single lump sum was not contemplated, but rather multiple annuity payments were referenced in this language. Moreover, Millipore contends it would not comport with this language to allow a participant to transfer funds from his or her MPP account into the MRP and then immediately convert and withdraw a lump sum, since the transfer to the MRP is described in the plan as "irrevocable."

Waters' interpretation of § 5.2(e) of the MRP also contradicts § 8.5(c) of the MPP, according to Millipore. Section 8.5(c) of the MPP states that a participant may transfer the portion of his or her MPP account balance necessary to purchase the gross benefit from the MRP if certain requirements are met. The remaining balance, if any, in the MPP, according to this section may "at the Participant's election, be used for the purchase of a *second* annuity or be paid to the Participant in a lump sum in cash." (emphasis added.) A participant could only acquire a second annuity if he or she had purchased a first annuity, not a lump sum, by transferring a balance to the MRP.

Millipore does not contest Waters' reading of the Early Retirement provisions and the resulting subsidy. Instead, it submits the affidavit of Michael Hluska, which states that

[i]n performing the annual actuarial valuations of the [MRP] required by the Internal Revenue Code and FAS 87 and in performing the calculation for the Section 414(1) transfer from the Millipore Retirement Plan to Waters' replacement retirement plan, Wyatt considered all provisions of the Millipore Plans, including the early retirement and transfer provisions. For purposes of each of these valuations, Wyatt assumed that every eligible employee would retire early at age 62 [because the actuarial subsidy for early retirement under the MRP is at its optimal level at age 62] and that every employee would choose to take his or her [MPP] account balance as a lump sum from the [MPP] rather than transfer the account balance to the [MRP] to obtain an annuity. Wyatt actuaries, myself included, have certified that these assumptions were reasonable, in conjunction with the other actuarial assumptions employed in these valuations, based on out analysis of historical and anticipated experience under the Millipore Plans.

Hluska Affidavit, ¶ 6. Therefore, the only issue of disputed construction is whether or not Millipore must account for the transfer liability since it is clear that the Plans provide for an Early Retirement Liability.[6]

### 3. Judicial Construction

Reviewing the two Plans at length, I find the Millipore reading and interpretation of the interplay among the Plan terms not to be

---

6. As I noted in note 3 *supra*, there is concurrent state court litigation related to the transfer of the assets from the plans of the former Millipore Chromatography employees to Waters. While the issue in the state court case apparently centers on contract obligations, which the parties suggest only raises a dispute over the PBO calculation, I note that the Purchase and Sale Agreement in § 8.8(iii) specifically requires a transfer of assets in compliance with IRC § 414(1). Before me in connection with the Early Retirement benefit is a similar dispute over the correct calculation of the § 414(1) amount based on an interpretation of the Plans and a determination of the reasonableness of the actuarial assumptions. The parties agree on the Plan interpretation with respect to the Early Retirement Subsidy. Yet, on the record before me, I cannot resolve the dispute over the reasonableness of the actuarial assumptions. Given the clear contract provisions referencing § 414(1), it appears that the state court litigation must necessarily include

resolution of this issue. The § 414(1) element of the state court case may arguably be preempted or otherwise reserved for this court, although I do not reach that issue in this memorandum. The contract which the parties negotiated and signed plainly states the assumptions to be used in calculating the PBO. If the state court determines that the assumptions used by Millipore and Wyatt satisfy the conditions of the Agreement by meeting the Financial Accounting Standards Board Statement 87 (FAS 87) rules, although not precisely determinative of the issue before me, that determination would indicate that the assumptions used by Wyatt were per se reasonable. Because the state court has not so determined and because I do not find the information before me sufficient to allow me to determine the reasonableness of Wyatt's assumptions in calculating transfer amounts to comply with the IRC, I do not resolve the question on these summary judgment submissions.

arbitrary and capricious, and further find upon *de novo* review I read and interpret the Plans in the same manner as does Millipore.

The Plans are not clear and unambiguous on their face and the parties have provided me as a linguistic matter with two alternative plausible constructions. In this circumstance, I look to the goals and structure of the Plans, their historical development and the consistency of the reading Millipore gives both as a matter of giving force to all the Plan language and of avoiding arbitrary differences in treatment of beneficiaries.[7]

The MRP was designed as a floor or safety net plan, (Powers Affidavit, ¶ 5), in order to supplement the MPP. Section 1.1 outlining the goal of the MRP clearly states that the purpose of the Plan is to "provide Participants ... with an assured minimum level of retirement income benefits ... in the event and to the extent that the benefits provided by [the MPP] are inadequate." A similar statement of intent appears in the Plan's SPD. Given this goal, no purpose of the MRP would be served if it were used to provide an economic bonus based on a manipulation of formulas to participants beyond the minimum floor benefit. The MRP exists to provide employees with a safety net, not a bonus scheme. The Millipore interpretation of the Plans aligns squarely with this purpose.

I find further that the history of § 8.5(c) of the MPP also supports Millipore's reading of the Plans. In 1983, § 8.5(c) was added to the MPP in order to meet the demands of some participants who wished to receive their entire gross benefit, rather than just the net benefit under the MRP, as a monthly annuity. (Powers Affidavit, ¶ 13.) Section 8.5(c) allowed these participants to transfer their MPP balance to the MRP in order to satisfy their desire to change the form of the benefit they would receive from a lump sum into an annuity. In 1989, Millipore employees whose MPP account balances exceeded the amount needed to satisfy the minimum floor benefit mandated by the MRP expressed a desire to transfer their entire balance, beyond that amount needed to exchange a lump sum for an annuity equal to the minimum benefit, to the MRP in order to receive an annuity for the equivalent value of their entire MPP account balance. (*Id.*) In response, § 8.5 was again amended. These changes are consistent with a reading that the transfer to the MRP from the MPP was only designed in order to enable participants to receive their benefits in the form of an annuity rather than a lump sum.

The Millipore interpretation of the Plans also allows them to be read in a manner most consistent with the dictates of settled principles of contract interpretation. Waters' interpretation is unacceptable because it renders terms, such as "second annuity" in § 8.5 of the MPP and "irrevocable" in § 4.1, meaningless. Millipore's reading, by contrast, gives meaning to all of the terms used and creates a comprehensive, consistent and integrated interpretation of both Plans.

In addition, the interpretation which Waters proposes would impose a virtually impossible burden and a clearly unanticipated cost on the Plans. *See Kennedy v. Electricians Pension Plan IBEW No. 995*, 954 F.2d 1116, 1121 (5th Cir.1992); *Krawczyk v. Harnischfeger Corp.*, 869 F.Supp. 613 (E.D.Wis. 1994), *aff'd* 41 F.3d 276, 279 (7th Cir.1994); *Allen v. Atlantic Richfield Retirement Plan*, 480 F.Supp. 848, 850 (E.D.Pa.1979), *aff'd*, 633 F.2d 209 (1980)(table). Waters' valuation estimate is an amount larger than the current actual assets of the MRP. Yet the employees transferring from Millipore to Waters comprise only approximately one-third of the to-

---

7. In this connection, as did the Third Circuit in *Moench*, 62 F.3d at 566, I have found helpful the factors enumerated by the Eighth Circuit for determining whether an interpretation of a plan is reasonable:

(1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirement of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.*, 48 F.3d 365, 371 (8th Cir.1995) (citing *Finley v. Special Agents Mut. Benefit Ass'n.*, 957 F.2d 617, 621 (8th Cir.1992)).

*Id.* at 566. *See also Bachelder v. Communications Satellite Corp.*, 837 F.2d 519, 522 (1st Cir. 1988).

tal number of employees currently participating in the MRP. It is inconceivable that Millipore would have created such an underfunded Plan to provide certain employees with a special bonus in this convoluted and circuitous manner. If Millipore wanted to give retiring employees such large cash bonuses upon retirement, it is almost certain that it would have so stated and modified its funding accordingly.

The Millipore Committee has not before this litigation been challenged to apply the Plans in the manner Waters urges and no participants have been allowed to obtain the Lump Sum Subsidy. In this connection, I note that I did not rely upon either the post-litigation amendment to the Plan [8] or the Millipore funding assumptions, except for their consistency with the position Millipore presses on me now. Due to the timing of the discretionary interpretation and amendment following commencement of the litigation, it cannot by itself be considered determinative of the intent of Millipore and the Committee when the Plans were established. Likewise, the fact that Millipore has funded the Plans in accordance with its interpretation of the subsidies is not dispositive of the issue. Both facts, however, are useful in my analysis because they demonstrate that Millipore and the Committee have never applied or interpreted the Plans in a manner contrary to their current position.

It is apparent that the Committee has not breached its duty to read the Plans in accordance with their terms. Rather, the Committee has correctly read and interpreted the Plans as barring a Lump Sum Subsidy.

### 4. The Early Retirement Subsidy Dispute

With respect to the Early Retirement Subsidy, the parties agree on the correct interpretation and application of the Plan. The dispute here is instead over the method of calculating the amount of assets to be transferred, the assumptions used by the actuarial firms in calculating the PBO and the adequacy of disclosure regarding the existence of the early retirement subsidy.

### (a) Transfer Amount Calculation

Waters contends that Wyatt's calculations, while they took into account the Plans' early retirement provision failed to account for the effect of the "transfer provision" in conjunction with the early retirement provision. In addition, Wyatt states that the actuarial subsidy for early retirement under the MRP is "at its optimal level when an employee is exactly 62 years old," (Hluska Affidavit, ¶ 6, n. 1), while Waters' actuary contends that the early retirement subsidy for an employee retiring between age 55 and 62 would be "greater than that provided to the employee who retires between the ages of 62 and 65." (Rafiee Certification, ¶ 14.)

The differences are disputes over questions of material fact concerning what constitute reasonable assumptions for calculation of the transfer amount under the Purchase and Sale Agreement. The Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment states on page 13 that "[t]here is a dispute between the parties about whether these actuarial assumptions [relating to the early retirement subsidy] are appropriate under the terms of the parties' purchase agreement and applicable accounting standards, but that issue is before the Massachusetts Superior Court." In oral argument, the parties explained that the issue before the state court is whether the actuarial assumptions are appropriate under § 8.8 of the agreement, which includes calculation of the PBO, using FAS 87, as well as calculation of the transfer amount under IRC § 414($l$). If the state court reaches the issue of reasonableness under § 414($l$), this issue will presumably be resolved. If, as the parties suggest, the court reaches only the issue of compliance with FAS 87 and the terms of the contract in calculating the PBO, there

---

8. I note that both parties refer to the 1996 Amendment of the Plans. Waters contends that it is prohibited by ERISA and the IRC as an elimination of a protected benefit. Millipore contends that it is merely a clarification of the previous Plans and therefore not an elimination because the benefits it "eliminated" could not have been obtained under the terms of the Plans. Because I find that the Plans do not allow for the Lump Sum Subsidy which Waters refers to, I view the 1996 Amendment as essentially a clarification of the previously ambiguous language of the Plans and made express what the fact of this litigation suggests was not so clear before.

would arguably remain before me a question of the reasonableness of Wyatt's assumptions in calculating transfer amounts to comply with ERISA and the IRC. Either way, summary judgment on this particular question is inappropriate at this time on this record.

### (b) *Provision of Complete and Accurate Information*

Section 404 of ERISA states that:

(a) a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . .

(b) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104. This has been interpreted to require a company "to provide employees with a comprehensive explanation of the contents of the plan." *Allen*, 480 F.Supp. at 851. ERISA requires fiduciaries to provide "complete and correct material information to a beneficiary." *Eddy v. Colonial Life Insurance Co.*, 919 F.2d 747, 750 (D.C.Cir.1990).

■ Waters contends that defendants breached their fiduciary duty by failing to communicate to retiring employees the "economic value of transferring the MPP account balance to the MRP" and therefore limiting Millipore's liability under the Early Retirement Subsidy. (Plaintiff's Memorandum in Support of its Motion for Partial Summary Judgment, 18–19.) I do not find this contention persuasive.

Millipore provides all employees with SPDs for both Plans. It also supplements these written documents with meetings to address participant concerns and makes available personnel to answer any questions from individual participants as they arise. (Beland Affidavit, ¶¶ 4–6.) When an employee is retiring, staff benefit personnel meet with the participant in order to review payment options under the MPP and MRP. (*Id.*) The employee is provided with a printout of the MPP account balance and any net benefit the participant might receive from the MRP,

as well as any monthly annuity payments he or she might receive under the alternate forms of payment provided for in the Plans. (*Id.* at ¶ 9.) Employees are also urged to consult a financial advisor to aid them in their choices. (*Id.*)

Millipore agrees that it does not advise an employee as to which option he or she should take. In fact Millipore states that it does not and will not advise an employee about which option might be more "valuable" because the value depends on individual circumstances beyond the knowledge of the Millipore benefits staff.

It is clear that it would be inappropriate for Millipore to advise participants as to the "value" of any particular option when that valuation would depend on the precise circumstances of each case. The "value" of an annuity over a lump sum differs according to the personal circumstances of each retiree. For example, an employee in splendid health with a long life expectancy who owns his home and does not currently face or anticipate facing the need for any large expenditures may "value" a lifetime annuity more highly than a retiree who is in poor health and expects to live only a few more years and who wishes to have a lump sum to dispose of immediately. If Millipore were to advise employee #2 that the transfer option as applied to the early retirement subsidy was more "valuable," problems of preference would arise. The variables would place extraordinary demands on the plan administrator and would plainly be beyond the scope of the fiduciary duty.

Waters contends that it is not claiming Millipore must make subjective judgments about preferences, but rather that Millipore has an obligation to tell early-retirement participants that the Early Retirement Subsidy applies to amounts transferred from the MPP to the MRP. In providing the detailed print-out and SPDs and in conducting the meetings with each departing employee, it appears that Millipore has more than met its duties under ERISA in this regard. Communications with beneficiaries do not need to detail each and every option and provide figures for conversion of each and every annuity or lump sum option available, in the

absence at least of direct inquiry from the beneficiary. It is clear from the information provided that there is available a valuable transfer option from the MPP to the MRP under the basic terms of the Plans. To require an additional statement focussing on the availability of the transfer option for Early Retirees when it is clear that it is meant to apply to all MPP amounts used to convert a lump sum into the floor amount annuity could imply that Millipore believes this to be the "preferable" option when, depending on particular circumstances and preferences, that may not be the case. The SPD and other documentation and information provided to employees make plain that the transfer option is available; it is clear from this material that it would also be available under the early retirement provisions. Therefore it is no breach of fiduciary duty for Millipore not to restate explicitly this availability to employees considering early retirement.

## V. Conclusion

For the reasons set forth more fully above, I hereby ALLOW the Millipore Motion for Summary Judgment except to reserve the question, to be taken up at a status conference with parties at 3:30 p.m., June 23, 1997, whether state court disposition of the contract PBO issue effectively resolves any issue which may remain in this case. *See generally,* note 3 at 11, note 6 at 27 and the discussion at 32–33 *supra.* The Waters Motion for Summary Judgment is hereby DENIED. The parties shall submit a joint status report on or before 12 noon, June 20, 1997, identifying what further action is necessary to resolve this case and shall address whether any remaining issues may more efficiently be resolved in the state court.

### JUDGMENT

In accordance with this Court's Memorandum and Order issued on May 23, 1997, Allowing Defendants' Motion for Summary Judgment, and denying Plaintiffs' Motion for Summary Judgment and the lack of any disputed issues as evidenced by the Joint Status Report filed July 10, 1997(# 49), it is hereby ORDERED

Judgment for the defendants against the plaintiffs.